UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DOREEN T. SCHOWALTER,　　　　　　　　　Civil Action No. 1:13-cv-249
　　　　Plaintiff,　　　　　　　　　　　　　　Weber, J.
　　　　　　　　　　　　　　　　　　　　　　Litkovitz, M.J.

　　vs.

THE PRUDENTIAL INSURANCE　　　　　　**REPORT AND**
COMPANY OF AMERICA, et al.,　　　　　　**RECOMMENDATION**
　　　　Defendants.

　　　　This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C.

§ 1001, *et seq.* ("ERISA").  Plaintiff Doreen T. Schowalter asserts an ERISA claim for benefits

under 29 U.S.C. § 1132(a)(1)(B) against Prudential Life Insurance Company of America

("Prudential") and Sara Lee Corporation ("Sara Lee").  Plaintiff contends that Prudential's

termination of her long-term disability ("LTD") benefits under the terms of her employer-

sponsored group benefits plan violates ERISA.  This matter is before the Court on the parties'

cross-motions for judgment on the administrative record (Docs. 19, 20), and their respective

opposing and supporting memoranda.  (Docs. 21-24).

## I. FACTUAL BACKGROUND

### A. The LTD Plan

　　　　Plaintiff is a former employee of Sara Lee.  (AR 437).[1]  By virtue of her employment

with Sara Lee, plaintiff elected to participate in a group long-term disability ("LTD") plan

known as the "Sara Lee Corporation Long Term Disability Plan," Group Plan No. 50009 ("the

Plan").[2]  Prior to early 2010, Sara Lee both administered the Plan and paid benefits under the

---

[1] "AR" refers to the Administrative Record filed in this case (Doc. 18), and the numbers following the "AR" designation are the last three digits of the cited page number.

[2] The Plan is now known as the "Hillshire Brands Long Term Disability Plan." (Doc. 20-1, Aff. of Joe Mead, ¶ 1).

Plan. (Doc. 20-1, Aff. of Joe Mead, ¶ 4). Sara Lee retained Prudential to administer the Plan

effective February 1, 2010. (*Id.*, ¶ 3). For disability claims made prior to February 1, 2010,

Prudential provides administration services but does not fund benefits. (*Id.*, ¶ 4).

The Plan provides for the payment of a monthly benefit if an employee is unable to work

due to disability as defined under the terms of the Plan. Section 2.4 of the Plan, "Payment of

Benefits," provides that benefits will be payable "upon receipt by the Administrator of due proof

and Conclusive Medical Evidence" that a covered employee has become "Totally Disabled. . . ."

(Doc. 20-1). The Plan defines an employee as "Totally Disabled" if, during a 180-day

"Elimination Period" and for the first 24 months following the Elimination Period, the employee

is unable to perform "each and all of the material duties pertaining to his or her occupation" due

to sickness or bodily injury and "is not engaged in any occupation or employment for wage or

profit for which he or she is reasonably qualified by education, training or experience." Plan §

2.6. After the monthly benefit has been paid for 24 months, the definition of "Total Disability"

changes to mean "the continuous inability of the Covered Employee, due to sickness or bodily

injury, to engage in each and every occupation or employment for wage or profit that he or she is

reasonably qualified to do or may become reasonably qualified to do by education, training or

experience without regard to (i) whether such occupation or employment exists in the geographic

area in which the Covered Employee resides, (ii) whether a specific vacancy in such occupation

or employment exists, (iii) whether a Covered Employee is likely to be hired if he or she applied

for such occupation or employment, and (iv) whether the earnings of such occupation or

employment are comparable to those earned by a Covered Employee before his or her

disability." Plan § 2.6. The Plan provides as a condition of a Covered Employee's entitlement to

disability benefits that "the Administrator shall have the right to direct such employee to submit

2

from time to time to an independent medical examination by a Physician designated by the Administrator." Plan § 2.7(a).

### B. Plaintiff's initial claim for benefits

In 1992, while employed in a sedentary position with Sara Lee as a Promotion and Marketing Manager, plaintiff underwent triple Coronary Artery Bypass Graft (CABG) surgery. (AR 437). Plaintiff subsequently left her position with Sara Lee on June 2, 1995, due to Ischemic Heart Disease. (*Id.*). She applied for LTD benefits, her claim was approved, and she was awarded LTD benefits due to Ischemic Heart Disease. (*Id.*). Plaintiff continued to receive LTD benefits for fifteen years.

### C. Prudential's termination of plaintiff's LTD benefits

Plaintiff received a letter dated July 29, 2010, from Carol Pichette, a Prudential Disability Consultant, informing her that Prudential had decided to terminate her benefits effective that date. (AR 472-74). The letter acknowledged that plaintiff had stopped working as a manager as of June 2, 1995, due to Coronary Artery Disease (CAD). (AR 472). The letter informed plaintiff that following initial approval of her claim for LTD benefits effective November 30, 1995, Prudential had received and reviewed additional medical information from Ohio Heart Vascular Center, psychiatrist Dr. Rodriguez, and internist Dr. Gerard Palermo, M.D. (AR 473). According to Ms. Pichette, the information showed that during a February 22, 2010 follow-up appointment with Dr. Rodriguez, plaintiff stated she was "doing good and continued to have a very good mood," she had accompanied her mother on a trip to Mexico in 2009, and the rest of the mental status examination findings were normal. (*Id.*). Further, when seen at Ohio Heart Vascular Center on March 2, 2010, plaintiff was reported to be "doing great from a cardiac standpoint"; plaintiff denied any chest pain, shortness of breath, palpitations, dizziness or

3

syncope; and it was noted that the CAD and hypertension diagnoses were stable. (*Id*.) The letter advised plaintiff that "based on the medical information in the file, you do not have any current restrictions and limitations that would prevent you from returning to work." (*Id*.). Plaintiff was notified of her right to appeal the decision to terminate her benefits. (*Id*.).

Plaintiff wrote letters to Prudential dated September 1, 2010 and November 5, 2010, indicating that she was appealing the termination decision. (*See* AR 467). Prudential informed plaintiff that she had been provided 180 days to submit her complete appeal and all supporting documentation for its review and that the 180-day period would expire on January 24, 2011. (*Id*.).

Plaintiff submitted supporting documentation showing that she had undergone a stress echocardiography on May 19, 2009. (AR 296-97). The results showed a left ventricular ejection fraction that was normal at rest and with stress; however, the "basal inferior wall showed a new regional wall motion abnormality during stress, indicating stress-induced ischemia." (AR 297).

The documentation also showed that plaintiff underwent a Carotid Duplex Evaluation on April 28, 2010. (AR 37-38). The history noted that a previous study performed in April 2009 had revealed bilateral internal carotid artery ("ICA") of 20-49% and a patent left subclavian artery stent. (AR 37). The impression was an estimated diameter reduction of the right internal carotid artery of 20% to 49%; estimated diameter reduction of the left internal carotid artery of 20% to 49%; no evidence of significant stenosis of the bilateral common and external carotid arteries; borderline bidirectional flow proximally of the right vertebral artery and the left vertebral artery was patent with antegrade flow; and the right subclavian artery had proximal turbulent flow suggestive of stenoses, the left subclavian artery showed no evidence of significant stenosis, and there was a pressure gradient difference between the right and left

4

brachial pressures with the right being 12 mm Hg less than the left. (*Id.*). The report noted:

"The presence of plaque in the common and or internal carotid arteries is associated with

increased risk for cardiovascular disease, even if the plaque produces only minimal stenosis."

(AR 38).

Plaintiff also submitted a letter dated September 7, 2010, from Jaime L. Ginney MPH

PA-C, and Dr. Dean Kereiakes, M.D., with The Ohio Heart & Vascular Center, who reported:

> This letter is in regards to appeal the decision to discontinue this patient's LTD.
> Doreen has a longstanding history of coronary artery disease, hypertension,
> diabetes, and peripheral vascular disease. She had CABG in 1992, followed by
> stent placement in 2006 and 2007. She is scheduled to have another stress test to
> rule out any progressive disease.
>
> Her last stress test in May of 2009 was abnormal with myocardial ischemia in the
> basal inferior wall, which was consistent with her known coronary anatomy and
> blockages. She continues to have symptoms of exertional chest discomfort, along
> with episodes of dyspnea with exertional activities. We are treating her medically
> at this time to try to improve and decrease the frequency of these symptoms with
> Aspirin, Plavix, Cardizem, Benicar, Maxzide, Lipitor, and Nitroglycerin. She
> cannot tolerate beta blocker thera[p]y due to depression. . . .

(AR 346).

On September 21, 2010, plaintiff underwent a stress test. (AR 23). The results were

abnormal and showed a "moderate-sized, moderate intensity defect involving the inferior wall,

which is reversible on the resting images"; normal left ventricular function with ejection fraction

of 77%; normal wall motion; and normal right ventricular size and function. (*Id.*). The

impression was "perfusion evidence of mild stress-induced ischemia involving the RCA

coronary distribution" which was similar to findings reported on the previous study dated June

26, 2007; normal left ventricular function and wall motion; and normal right ventricular size and

function. (AR 24).

Prudential requested that an independent medical examiner (IME) review plaintiff's records. Dr. Mark Eaton, M.D., an internist with a sub-specialty certification in cardiovascular disease, reviewed plaintiff's records and prepared a report dated February 22, 2011. (AR 169-72). He summarized the records as showing a history of depressive disorder ("prior ECT [electroconvulsive] therapy in 6-2009"), diabetes mellitus, hypertension, hyperlipidemia, and CAD ("prior surgical 1992 and percutaneous coronary artery revascularization in 2006 and 2007"). (AR 170). A carotid duplex evaluation performed on April 28, 2009, demonstrated non-obstructive plaque in the internal carotid arteries bilaterally. (*Id.*). A stress echocardiography on May 19, 2009, demonstrated evidence of exercise induced inferior wall hypokinesis. (*Id.*). A lower extremity arterial examination on September 9, 2009, was normal despite foot pain and a history of diabetes mellitus. (*Id.*). On September 7, 2010, nuclear stress testing was recommended after plaintiff was seen at The Ohio Heart & Vascular Center and complained of "some recurrence of chest discomfort." (*Id.*). The physical examination was unremarkable. (*Id.*). Myocardial perfusion imaging performed on September 21, 2010, disclosed a reversible inferior wall perfusion defect. (*Id.*). The left ventricular ejection fraction (LVEF) was measured at approximately 77%. (*Id.*).

Dr. Eaton recommended restricting plaintiff to "a light level of work (exerting up to 20 pounds of force occasionally and/or up to 10 pounds of force frequently)" based on known CAD and prior abnormal stress testing. (AR 171). He recommended that this restriction remain in place on an indefinite basis or until plaintiff underwent diagnostic coronary angiography and either surgical or percutaneous artery revascularization. (*Id.*). Dr. Eaton based his recommendation on findings that the record did not indicate "symptoms consistent with progressive angina pectoris, decompensated heart failure or symptoms consistent with a

6

clinically significant cardiac dysrhythmia"; there was no documentation indicating plaintiff

required "recent coronary angiography for recurrent chest pain in the last 3 years or

documentation of an inpatient hospitalization or emergency room visit for chest pain symptoms";

and despite known CAD, review of the medical records did not provide objective medical

documentation to preclude full-time light level work from a cardiovascular standpoint. (AR

170). Dr. Eaton stated:

> The claimant was seen at the Ohio Heart & Vascular Center on 9-7-10 and noted "some recurrence of chest discomfort." Physical examination was unremarkable. Nuclear stress testing was recommended. Reversible inferior wall perfusion defect noted on myocardial perfusion imaging on 9-21-10. The claimant's LVEF (left ventricular ejection fraction) was measured at approximately 77%. Given this, the above restrictions would be reasonable.

(AR 171).

An ophthalmologist, Dr. Joseph S. Goetz, M.D., reviewed the record for Prudential and

prepared a report dated February 22, 2011. (AR. 174-77). He opined that the medical records

did not support any medically necessary restrictions or limitations from any one condition or

combination of conditions from August 1, 2010 forward. (AR 176).

On May 24, 2011, vocational rehabilitation specialist Ralph Gilpatrick reported on how

plaintiff's regular occupation would normally be performed. (Tr. 480-82). He assessed

plaintiff's job as a sedentary level position. (AR 481).

Dr. Paul T. Hogya, M.D., examined plaintiff on behalf of Prudential and prepared a

report dated August 31, 2011, based on his examination results and the findings of the other

examining physicians, which he accepted for purposes of his report while not necessarily

accepting their conclusions. (AR 84-88). Dr. Hogya noted that plaintiff has a long-standing

history of CAD, hypertension, diabetes mellitus, osteoarthritis, gout, hyperlipidemia, peripheral

7

vascular disease and major depression. (AR 84). He specifically noted: "history of coronary bypass graft x3 in 1992"; additional coronary stenting in September 2006 and January 2007; abdominal aortic duplex scanning in July 2007, which disclosed aortic and bilateral common iliac stenosis; arterial duplex studies of the lower extremities in September 2009 which yielded normal results; carotid duplex studies in April 2010 which revealed 20% to 49% reduced diameter of the right and left internal carotid arteries, with the left subclavian artery showing no evidence of significant stenosis; stress echocardiogram in May 2009 which showed inferior wall motion abnormality with EF 57%; and recent myocardial perfusion imaging on September 21, 2010, which revealed a reversible moderate-sized inferior wall defect, with EF 77%. (AR 84). Dr. Hogya explained plaintiff's functional impairment as follows:

> From an objective medical stand point, I do not actually find much in the way of any functional impairment relative to the physical diagnoses discussed above. Her hypertension is well-controlled. Overall, she has general good control of her diabetes mellitus. . . . Her coronary artery disease has remained stable status post triple bypass in 1992 with supplemental coronary stenting in 2006 and 2007. Her Lexiscan stress test 9/21/2010 showed a moderate reversible inferior wall defect with excellent ejection fraction of 77%. She has had no complicating dysrhythmia or congestive heart failure. She reports osteoarthritis, primarily involving the upper and lower spine, right knee and right wrist. I have found no objective synovitis. She has history of gout with no residual joint deformity.

(AR 86-87). Dr. Hogya found that plaintiff's self-reported functionality was not supported by objective testing, examination findings and observations. (AR 87). Dr. Hogya opined that it was reasonable to limit plaintiff to light level work, which meant restricting her to lifting, carrying, pushing or pulling 20 pounds occasionally and 10 pounds frequently. (*Id.*).

On September 8, 2011, Claims Manager Leigh L. Adams notified plaintiff of Prudential's decision to uphold its original decision terminating her LTD benefits. (AR 449-52). The denial letter stated, in pertinent part, as follows:

We have thoroughly evaluated the medical information on file, as well as the documentation received with your appeal. . . .
. . . .

As part of the review we also requested a review by a clinician Board Certified in Internal Medicine with a Sub Specialty Certificate in Cardiovascular Disease. This reviewer reports:

"Given known coronary artery disease and prior abnormal stress testing I would recommend restricting the claimant to a light level of work (exerting up to 20 pounds of force occasionally and/or up to 10 pounds of force frequently) on a full-time basis.

Review of the medical records submitted do [sic] not indicate symptoms consistent with progressive angina pectoris, decompensated heart failure or symptoms consistent with a clinically significant cardiac dysrhythmia.  There is no documentation to indicate that the claimant required recent coronary angiography for recurrent chest pain in the last 3 years or documentation of an inpatient hospitalization or emergency room visit for chest pain symptoms. Despite known coronary artery disease review of the medical records does not provide objective medical documentation to preclude full-time [work] from a cardiovascular standpoint (8 hours daily/40 hours weekly) in a light level occupation. . . ."

The claimant was seen at the Ohio Heart & Vascular Center on 9-7-10 and noted 'some recurrence of chest discomfort.'  Physical examination was unremarkable. Nuclear stress testing was recommended.  Reversible inferior wall perfusion defect noted on myocardial perfusion imaging on 9-21-10.  The claimant's LVEF (left ventricle ejection fraction) was measured at approximately 77%. Given this, the above restrictions would be reasonable."

The duration of these restrictions and limitations were reported to be indefinite or until you undergo diagnostic coronary angiography and either surgical or percutaneous coronary artery revascularization.

All in all, this reviewer did not agree that you were totally disabled from work as a result of a combination of conditions. This reviewer reports:

"Review of the medical records submitted do [sic] not indicate symptoms consistent with progressive angina pectoris, decompensated heart failure, symptoms consistent with a clinically significant cardiac dysrhythmia, [or] clinically significant carotid or peripheral arterial disease despite multiple medical conditions.  A carotid duplex, dated 4-28-09 demonstrated non-obstructive plaque in the ICA bilaterally.  A stress echocardiography dated 5-19-09 demonstrated evidence of exercise induced inferior wall hypokinesis.  A normal lower extremity

arterial examination was noted on 9-9-09 despite foot pain and a history of diabetes mellitus. Despite known coronary artery disease, diabetes mellitus, and high blood pressure review of the medical records does not provide objective medical documentation to preclude full-time [work] from a cardiovascular standpoint (8 hours daily/40 hours weekly) in a light level occupation."

As part of the review, we also requested an Independent Medical Examination by a Fellow of the American College of Emergency Physicians [Dr. Hogya]. After speaking with you, examining you and reviewing the available records, this examiner reports there was not much found relative to your physical diagnosis in terms of impairment. Your hypertension was well controlled as was your diabetes. Your coronary artery disease was stable post triple bypass of 1992 with stenting in 2006 and 2007. Your stress test of September 21, 2010 was reported to show moderate reversible inferior wall defect with an excellent ejection fraction of 77%. There was no noted complication of dysthymia [sic] or congestive heart failure. The osteoarthritis of the low spine, right knee and right wrist were reported to show no synovitis. There was a history of gout involving primarily the toes[,] however there was no reported residual joint deformity. The reviewer reported that your self-reported symptoms and limitations far outweighed the findings and testing. The reviewer did opine that you would have restrictions and limitations. This would involve lifting 20 [pounds] occasionally[,] 10 [pounds] frequently, and [a] negligible amount constantly. There were no other restrictions or limitations noted. There were symptom magnification and somatic complaints but this examiner did not address depression treatment.
. . . .

After reviewing your medical records, we have determined that you do not have restrictions or limitations from an ophthalmology standpoint. You do have restrictions and limitations from a cardiac perspective. These would not preclude you from performing your sedentary position. The data indicates you have a history of depression. The primary reason you stopped working and the primary reported condition in your appeal and in supporting narratives from Dr. Polermo [sic] are cardiac in nature. In addition, the data indicates you have responded to ECT treatment provided in 2009 and antidepressants. The available data does not support that you are receiving treatment by a psychiatrist or mental health provider who is providing any restrictions and limitations for this condition. Therefore, Prudential did not conduct further medical analysis of this condition. We have received and acknowledge the opinion dated August 31, 2011 [of] Gerald A[.] Polermo [sic] who reports that you are totally disabled from performing any job function as a result of your medical conditions including coronary artery disease as stated by your cardiologist (Dr. Karieakes) [sic]. As this letter was subsequent to your independent medical examination, we contacted Dr. Polmero's [sic] office and were told you were last seen there by an RN in April 2011 and last seen by Dr. Polermo [sic] in 2010. Therefore, while we

> acknowledge this opinion, the independent medical examiner has provided the
> most up to date assessment based on direct examination of your condition(s).  The
> independent examiner as well as two file reviewing specialists has [sic] opined
> you have restrictions and limitations.  These restrictions and limitations would not
> preclude you from performing your sedentary occupation. As a result, we have
> upheld our decision to terminate your claim for LTD benefits.

(AR 449-52).

On October 18, 2011, plaintiff filed a second appeal in accordance with the Plan's appeal

procedure. (AR 72-73).  In connection with the appeal, Dr. Martin Fritzhand, M.D., an Ohio

Bureau of Workers Compensation and Ohio Industrial Commission Certified Independent

Examiner, performed an independent medical examination and prepared a report on March 7,

2012, at plaintiff's request. (AR 43-47).  Dr. Fritzhand noted pertinent findings of angioplasty

and stenting in September 2006 and January 2007; percutaneous transluminal angioplasty and

stent deployment of the left subclavian artery in January 2007 for a left subclavian steal

syndrome; an "aortic and bilateral common iliac artery stenosis" diagnosis following an aortic

evaluation in July 2007; and 20-49% stenosis found on a carotid duplex ultrasound in February

2008. (AR 43).  Dr. Fritzhand reported that according to Dr. Kereiakes's September 2010 notes,

plaintiff's "stress test in May 2010 was abnormal with myocardial ischemia in the basal inferior

wall . . . she continues to have symptoms of exertional chest discomfort, along with episodes of

dyspnea with exertional activities.["] (*Id.*).  Dr. Fritzhand further noted that Dr. Kereiakes stated

in a September 2010 letter related to plaintiff's appeal of the decision to terminate her benefits

that plaintiff had "perfusion evidence of mild stress-induced ischemia involving the RCA

coronary distribution . . . inferior ischemia. . . ." (*Id.*).  Dr. Fritzhand found that plaintiff

continued to have shortness of breath and chest pain. (*Id.*).  He opined that:

> At present, the patient can ambulate on level terrain for no more than 100 feet
> without associated shortness of breath, and this symptom increases upon climbing

11

stairs or walking up grades. The patient is unable to perform housework or shopping without associated dyspnea. The patient occasionally awakens during the night with shortness of breath relieved by a sitting position, and denies history of a chronic cough. She has intermittent episodes of "like a discomfort" present over the substernal and left parasternal regions with radiation to the left arm, occurring 'on a daily basis,' lasting up to thirty minutes, and responding to 1-2 sublingual nitroglycerines. Chest pain is related to both stress and exertion. The patient takes 2-4 nitroglycerines daily. . . .

. . . .

In summary, this is an unfortunate morbidly obese middle-aged woman with long-standing coronary artery disease who has required extensive coronary revascularization. She subsequently has required multiple percutaneous coronary interventions as well as intervention for a left subclavian steal syndrome. She continues to have ongoing shortness of breath and chest pain requiring 2-4 nitroglycerines daily for treatment of angina pectoris. The patient was comfortable in both the sitting and supine positions and breath sounds are clear. There is no clinical evidence of congestive heart failure: the neck veins are not distended, there is no gallop, there is no hepatojugular reflux, and pedal edema is absent. Her peripheral vascular status is reasonably intact. She also has ongoing pain and discomfort especially involving the low back and right knee. She ambulates with a slow limping gait and had difficulty forward bending. Range of motion studies are diminished. There are no joint abnormalities as heat, swelling and capsule thickening are absent. There is no evidence of nerve root damage as changes can be attributed to an underlying diabetic peripheral neuropathy. The patient is receiving psychiatric care for a major depressive disorder. Daily activities would be restricted and interests restricted by her mental status. It is certainly my medical opinion that Ms. Schowalter has a severe functional impairment. She is incapable of performing even a mild amount of ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects. Her illnesses are so great that she would be unable to perform remunerative employment.

I would like to address certain issues raised [by plaintiff's counsel]. It is certainly my medical opinion that Ms. Schowalter is totally disabled as defined in her long-term disability policy. She certainly has "continuous inability . . . due to sickness . . . to engage in each and every occupation or employment for wage or profit that he or she is reasonably qualified to do. . . ." Her illnesses and impairments are so great that she is incapable of performing remunerative employment. In addition, I have reviewed Dr. Hogya's report dated August 31, 2011. I am in complete disagreement with his assessment. Ms. Schowalter has had severe coronary artery disease for many years and has suffered from cerebral and peripheral vascular disease. Again, she is certainly incapable of performing any remunerative employment.

12

(AR 45-47).

On June 18, 2012, Claim Manager Dr. Jill Fallon, M.D., a physician who is Board

Certified in Occupational Medicine, performed a clinical review of the medical records.  (AR

485-87).  On June 26, 2012, Prudential obtained a supplemental opinion from Dr. Fallon as to

medications/side effects, with Dr. Fallon reporting the medical records did not support

significant medication or side effects.  (AR 488).  On June 28, 2012, Prudential sent plaintiff's

counsel a letter through Senior Appeal Analyst Carla Moore stating that it had completed its

second review of plaintiff's request for reconsideration of the decision to terminate her claim for

LTD benefits and had determined to uphold the decision.  (AR 437-41).  The letter stated that

plaintiff's claim file, including updated medical records and IME reports from Dr. Hogya and

Dr. Fritzhand, had been referred for a review by Prudential's consulting physician (Dr. Fallon).

The letter provides, in pertinent part, as follows:

> The records documented in the claim file do not support progression or
> deterioration since the external medical file review dated September 2011 or
> beyond the paid through date of July 31, 2010.  Ms. Schowalter has been
> medically stable since July 31, 2010.
>
> There is no medical record supporting impairment due to cardiac, hypertension or
> vascular conditions.  The additional medical records received after September
> 2010 failed to support any deterioration: no significant change since the external
> [sic] cardiac physician's review dated February 22, 2011.  Physical examinations
> (PE) and testing remained stable and there was a lack of intensity of
> testing/treatment consistent with impairment.
>
> A September 7, 2010, record from Ohio Heart and Vascular Center
> Ginney/Kereiakes Physical examination was unremarkable except for body mass
> index (BMI) level of 40.  The plan noted that Ms. Schowalter was stable post
> coronary artery bypass grafting (CABG)/Stenting.  A follow up evaluation record
> dated September 21, 2010 noted LVEF (left ventricular ejection fraction) was
> normal with normal wall motion and measured at approximately 77% and normal
> right ventricle (RV) size and function.

August 31, 2011, the IME report by Dr. Hogya noted "I do not actnally [sic] find much in the way of any functional impairment relative to the physical diagnoses, no dysrhythmia or CHF (congestive heart failure).

May 4, 2011, record from Kereiakes documented that Ms. Schowalter was asymptomatic with no change on medications, no intermittent claudication or lower extremity edema. The physical exam was normal/negative except for carotid bruits B, gait normal[,] no edema[,] mood appropriate. The impression (IMP) is stable Carotid artery disease, stable, hypertension (HTN), hyperlipidemia (HLP), stable.

October 28, 2011 the record noted that there was no Carotid Duplex change since previous study in April 2010.

November 2, 2011, the record from Ginney/Kereiakes documented that Ms. Schowalter was doing okay from cardiac standpoint.

March 7, 2012, the IME report from Dr. Fritzhand documented that Ms. Schowalter's heart rate was regular without (w/o) murmur or gallop. No evidence of peripheral vascular insufficiency, varicose veins or stasis ulcers, lungs were clear. The IME admits there is no evidence of CHF. He also admits that "Her peripheral vascular status is reasonably intact."

May 15, 2012, the record from Ginney/Kereiakes, MD documented re-visit in six months. There were physical examination comments documented.

The file reviewer opined that there is no evidence supporting any impairment based on severity of psychiatric conditions. There was no evidence of psychiatric condition until 2009 and then it was limited and successfully treated. Ms. Schowalter was able to transition to a new conntry [sic] from India, obtain a degree (Bachelor's in Science), and sustain a successful marriage for 19 years. The records reveal improvement after 2009. Consistent with this is that there is a lack of intensity of treatment beyond 2009 with records noting only one medication, no additional ECT (electric shock therapy), and follow up evaluations scheduled three times per year.

The reviewing physician opined that the medical records do not support impairment based on SRS (self-reported symptoms).

During the August 31, 2011 IME by Hogya MD, Ms. Schowalter complained of (c/o) constant pain stating per pain level was 10 out of 10 (10/10) in intensity on a pain scale with 10 being the highest. However, she was able to sit comfortably while relating her history and vital signs remained normal (no elevated blood pressure (BP) or pulse) and there was no atrophy or weakness consistent with prolonged inactivity associated with 10/10 pain.

14

The IME performed by Dr. Fritzhand, did not find any abnormalities or elevated vital signs (VS).  On neurologic evaluation of the LE (lower extremities), there was no evidence of muscle weakness or atrophy.

The file reviewer opined that there is no evidence supporting work impairment due to gout or diabetes.  There was no evidence of deformity due to gout.  There was no evidence of any acute attacks or emergency room (ER) visits.  There is no documented evidence supporting medication side effects.

After completing a thorough review of Ms. Schowalter's claim file, medical records, IME reports and consulting physician review, we have determined that Ms. Schowalter did not remain impaired after July 31, 2010.  While we recognize and acknowledge that she has documented history for cardiac disease, diabetes, hypertension and depression, these conditions were treated successfully.  We find that she should have been capable of returning to work in her regular occupation as of August 1, 2010.  There was no evidence of a severe change in any of her medical condition(s) that warranted further work impairment.  It is reasonable to remain/require routine medical care and work at the same time. . . .  We are upholding the decision to terminate benefits effective July 31, 2010.

(AR 439-40).

## III.  THE PARTIES' POSITIONS

Plaintiff concedes that the Plan Administrator's decision is reviewed under the arbitrary and capricious standard.[3]  (Doc. 19 at 10).  Plaintiff argues that Prudential's decision to deny her claim for LTD benefits is arbitrary and capricious for three reasons.

First, plaintiff argues that the decision is arbitrary and capricious because she continues to suffer from the same ailments she had when she was originally awarded LTD benefits - CAD, post-CABG with multiple saphenous vein graph failures, diabetes mellitus type II, hypertension,

---

[3] Plaintiff alleges in his motion for judgment on the administrative record that Prudential is the entity who decides which claims are covered and is also the payer of those claims under the Plan, so that the Court should view Prudential's decision to terminate plaintiff's LTD benefits in light of Prudential's purported conflict of interest. (Doc. 19 at 11, citing AR 119, 121).  However, plaintiff does not dispute Prudential's allegation that it is not the payer of benefits under the Plan. (Doc. 20 at 2, citing Aff. of Joe Mead, ¶¶ 4, 5).  Instead, prior to February 2010, Sara Lee both administered the Plan and paid Plan benefits; effective February 1, 2010, Sara Lee continued to pay Plan benefits for disability claims made prior to that date while Prudential administered the Plan.  (Mead Aff., ¶¶ 3, 4).  Thus, there is no conflict of interest in this case.

and severe depression - and Prudential has not pointed to any medical evidence to show she has improved since that time. (Doc. 19 at 11-12, citing AR 45). To the contrary, plaintiff argues that if anything, her condition has worsened in that she has been diagnosed with a new heart abnormality, *i.e.*, a new regional wall motion abnormality in the basal inferior wall documented during stress, indicating stress-related ischemia. (*Id*. at 12; Doc. 21 at 4, citing AR 297). Plaintiff contends that Prudential's failure to offer baseline medical records from 1995 that, when compared to the more recent medical records, demonstrate any change in her condition and the absence of facts in Prudential's letters and the medical record showing she has improved over time demonstrate that Prudential did not have a sufficient rationale to terminate her benefits. (Doc. 19 at 12).

Second, plaintiff contends that Prudential's decisions to terminate her LTD benefits and to uphold the termination decision on appeal are not supported by substantial evidence but are against the weight of the medical records. (Doc. 19 at 12-15). Plaintiff contends that the letter informing her of the initial benefits termination decision does not "highlight any medical documentation regarding the reasons she was originally placed on LTD" (*Id*. at 12, citing AR 472-74), and it does not include the results of a May 19, 2009 echocardiography plaintiff underwent due to angina pectoris, which showed results consistent with myocardial ischemia and a new regional wall motion abnormality in the basal inferior wall during stress, indicating stress-related ischemia. (*Id*., citing AR 296-97).

Plaintiff also takes issue with Prudential's June 2012 final denial letter finding that plaintiff's medical records did not show symptoms "consistent with progressive angina pectoris" and that there was no record of inpatient hospitalizations or emergency room visits. Plaintiff contends these findings show Prudential's decision was arbitrary and capricious because (1)

Prudential arbitrarily defined which medical records were relevant to the termination decision,

(2) Prudential ignored objective medical evidence in the form of treatment notes and stress test

results which document that plaintiff's CAD was worsening, and (3) Prudential "cherry-picked"

evidence from the record to support a finding a non-disability. (*Id*. at 13-16). Specifically,

plaintiff contends that Prudential ignored the following evidence in its June 2012 letter:

- 4/28/10 Carotid Duplex Evaluation showing estimated diameter reduction of right and left internal carotid arteries of 20-49% (AR 38-39)

- 9/7/10 Ohio Heart & Vascular Center office visit note stating plaintiff had been under increased stress, she was complaining of some recurrence of chest discomfort on and off with dyspnea on exertion, she had gained a significant amount of weight over the preceding few months which was probably contributing to her fatigue and shortness of breath, and a screening nuclear test was planned due to some increased symptoms of dyspnea on exertion and episodes of chest pain (AR 14)

- 9/21/10 stress test which yielded abnormal findings of: (1) perfusion evidence of mild stress ischemia involving the RCA coronary distribution; and (2) the inferior ischemia was similar to the findings reported on the previous study dated June 26, 2007 (AR 23-24)

- Dr. Fritzhand's findings on review of the medical records that plaintiff continues to have shortness of breath and chest pain, she can ambulate on level terrain for no more than 100 feet without associated shortness of breath and the symptom increases upon climbing stairs or walking up grades, and she cannot perform housework or shopping without associated dyspnea (AR 45-47)

(Doc. 19 at 13-14).

Finally, plaintiff asserts that Prudential's decision to terminate her benefits is arbitrary

and capricious because both of her treating physicians have opined that she is totally disabled.

(Doc. 21 at 2-3). Specifically, Dr. Gerald A. Palermo, M.D., wrote a letter dated December 2,

2010, stating in full: "This is to state that I am in total agreement with appeal initiated by Dr.

Dean Kereiakes, Mrs. Schowalter's cardiologist, regarding her disability claim." (AR 340). Dr.

Kereiakes wrote a letter dated August 16, 2011, which states in full: "Doreen Schowalter has

been a longtime patient of mine and is permanently disabled." (AR 92). Dr. Palermo wrote a

second later dated August 31, 2011, opining that plaintiff "is totally disabled from performing

any job function due to her underlying medical conditions, including coronary artery disease, as

previously stated by her cardiologist and detailed elsewhere." (AR 90). Plaintiff contends that it

was arbitrary and capricious for Prudential to accept the opinion of the examining physician, Dr.

Hogya, a specialist in emergency medicine, over the opinion of Dr. Kereieakes, a specialist in

coronary artery disease. (Doc. 24 at 4-5).

Defendant Prudential contends that its decision to terminate benefits was reasonable.

Prudential contends that it reasonably relied on the following evidence cited in its June 28, 2012

letter denying plaintiff's request for reconsideration:

- Evidence showing plaintiff has been medically stable since July 31, 2010

- The absence of a medical record supporting impairment due to cardiac, hypertension or vascular conditions

- The Ohio Heart & Vascular Center record from 9/7/10 noting that plaintiff's physical examination was unremarkable except for a body mass index (BMI) of 40 (AR 439)

- IME Dr. Hogya's 8/31/11 report which states: "I do not actually find much in the way of any functional impairment relative to the physical diagnoses, no dysrhythmia or CHF (Congestive Heart Failure)." (AR 439)

- The 9/2/11 office visit note from PA Ginney/Dr. Kereikas reporting that plaintiff was "doing okay" from a cardiac standpoint (AR 439)

- Dr. Hogya's 8/31/11 observations and findings calling into question plaintiff's self-reported complaints of constant pain which she rated as 10/10, including his notes that plaintiff was able to sit comfortably while relating her history, vital signs remained normal, and there was no atrophy or weakness consistent with prolonged inactivity associated with her self-reported pain level (AR 440)

(Doc. 20 at 9-10). Prudential asserts that plaintiff's treating physicians' statements that she is

disabled and unable to work "are short conclusions offered by medical professionals and do not

appear to be based upon a thorough analysis of Plaintiff's medical condition in conjunction with the terms of the long-term disability plan." (*Id*. at 11). Prudential argues that it was entitled to give these conclusory statements less weight.

In response, plaintiff alleges that Prudential failed to give proper weight to her treating physicians. (Doc. 21; Doc. 24 at 4-5, citing AR 92). Plaintiff argues it was unreasonable for Prudential to give more weight to the opinions of Dr. Hogya and Dr. Eaton, who never addressed how the medical conditions which entitled plaintiff to LTD benefits for 15 years improved, and other non-examining medical reviewers, and to ignore the opinion of her treating cardiologist, Dr. Kereiakes, who has followed her for many years. In addition, plaintiff alleges that Prudential has failed to address two key issues: first, Prudential failed to explain why she is capable of working today with symptoms which previously entitled her to disability and which are supported by objective findings, including abnormal results from a stress echocardiography which disclosed a new regional wall motional abnormality during stress (AR 297) and a September 21, 2010 stress test disclosing an inferior ischemia similar to the inferior ischemia reported on a June 26, 2007 study (AR 23-24). (Doc. 21 at 4-5). Plaintiff contends that it is not reasonable to deny LTD benefits to an individual who suffers from the same ailments that entitled her to such benefits previously. Second, plaintiff alleges that Prudential has not properly addressed the effects of stress on her heart. Plaintiff contends that Prudential's conclusion that she could perform her regular sedentary job is not supported by the record because she experiences shortness of breath when walking a very short distance and her heart reacts in an abnormal way when she is exposed to stress. (Doc. 21 at 6). Plaintiff relies on the results of the May 2009 and September 2010 stress tests and her subjective complaints to Dr. Fritzhand in support of her argument.

Prudential contends that it reasonably concluded that plaintiff is able to perform sedentary work and therefore no longer meets the criteria for continuing benefit eligibility because her conditions, including cardiac disease, "were treated successfully." (Doc. 22 at 2, citing AR 440). Prudential asserts that while plaintiff's condition requires certain vocational restrictions, those restrictions would not preclude her from performing her sedentary occupation. (*Id.*, citing AR 451-52). Prudential denies that it "cherry picked" the evidence and contends it considered all of the evidence of record. (*Id.* at 11). Prudential asserts that it reasonably relied on the conclusions of its IMEs made after careful review and rejected the one-sentence unsupported, conclusory statements of plaintiff's two treating physicians, which were devoid of any analysis and contrary to their own objective findings.

## IV. ERISA LAW

The Sixth Circuit has directed that claims regarding the denial of ERISA benefits are to be resolved using motions for judgment on the administrative record. *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609, 619 (6th Cir. 1998). The district court is to conduct its review "based solely upon the administrative record." *Id. See also Zenadocchio v. BAE Sys. Unfunded Welfare Ben. Plan*, 936 F. Supp.2d 868, 872 (S.D. Ohio 2013). The Court's review is confined to the administrative record as it existed on the date the administrator issued its final decision upholding the termination of the claimant's LTD benefits. *Moon v. Unum Provident Corp.,* 405 F.3d 373, 378 (6th Cir. 2005).

There is no dispute that Prudential's decision to terminate plaintiff's LTD benefits in this case is subject to the arbitrary and capricious standard of review. Under the arbitrary and capricious standard of review, this Court must determine whether Prudential's decision to terminate plaintiff's LTD benefits "is the result of a deliberate, principled reasoning process and

20

. . . is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006)

(quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th

Cir. 1991)). Substantial evidence means "much more than a mere scintilla. It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Holler v. Hartford Life & Acc. Ins. Co.*, 737 F. Supp.2d 883, 891 (S.D. Ohio 2010) (citing

*McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 171 (6th Cir. 2003)). When it is

possible to offer a "reasoned explanation" for the decision to deny benefits based on the

evidence, the outcome is not arbitrary or capricious. *Cook v. Prudential Ins. Co. of Am.*, 494 F.

App'x 599, 604 (6th Cir. 2012) (citing *Davis v. Kentucky Finance Cos. Retirement Plan*, 887

F.2d 689, 693 (6th Cir. 1996)).

     The arbitrary and capricious standard of review is not a mere rubber stamp of the plan

administrator's decision. *Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 508 (6th Cir. 2009)

(citing *Moon*, 405 F.3d at 379); *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)

(citing *McDonald*, 347 F.3d at 172). As the Sixth Circuit stated in *McDonald*:

> [T]he district court had an obligation under ERISA to review the administrative
> record in order to determine whether the plan administrator acted arbitrarily and
> capriciously in making ERISA benefits determinations. This obligation
> inherently includes some review of the quality and quantity of the medical
> evidence and the opinions on both sides of the issues. Otherwise, courts would be
> rendered to nothing more than rubber stamps for any plan administrator's decision
> as long as the plan was able to find a single piece of evidence--no matter how
> obscure or untrustworthy--to support a denial of a claim for ERISA benefits.

347 F.3d at 172. "Deferential review is not no review, and deference need not be abject." *Id.*

(internal quotation and citation omitted).

     In a termination of benefits case, "it is reasonable to require a plan administrator who

determines that a participant meets the definition of 'disabled,' then reverses course and declares

that same participant 'not disabled' to have a *reason* for the change," whether that evidence is

new or old medical evidence showing improvement in the claimant's medical condition or a

change in the plan's definition of disability. *Morris v. American Electric Power Long-Term*

*Disability Plan*, 399 F. App'x 978, 984 (6th Cir. 2010) (emphasis in original). Lack of a reason

for the change is "the very definition of 'arbitrary and capricious.'" *Id. See also Kramer v. Paul*

*Revere Life Ins. Co.*, 571 F.3d 499, 507 (6th Cir. 2010) (plan administrator's decision to

terminate disability benefits after five years in the absence of evidence showing medical

improvement and based on medical consultants' opinions that supported proposition the plaintiff

was never disabled from her own occupation was arbitrary and capricious). The court should not

uphold a decision to terminate benefits when there is an absence of reasoning in the record to

support the termination. *Neaton v. Hartford Life and Acc. Ins. Co.*, 517 F. App'x 475, 483 (6th

Cir. 2013) (citing *McDonald*, 347 F.3d at 172).

A plan administrator is not obligated to give deference to a claimant's treating

physicians' opinions over the opinions of its own consulting physicians. *Black & Decker*

*Disability Plan v. Nord,* 538 U.S. 822 (2003). The opinions of a treating physician are not

entitled to a presumption of deference when evaluating a denial of benefits under an ERISA plan.

*Id. See also Vochaska v. Metropolitan Life Ins. Co.*, -- F. Supp.2d --, No. 1:12-cv-1070, 2014

WL 222116, at *6 (W.D. Mich. Jan. 21, 2014) (finding district court was bound by Supreme

Court decision in *Nord* rejecting treating physician rule in ERISA cases). However, a plan may

not arbitrarily disregard such opinions in making a benefits determination. *Vochaska,* No. 1:12-

CV-1070, 2014 WL 222116, at *6. "Generally speaking, a plan may not reject summarily the

opinions of a treating physician, but must instead give reasons for adopting an alternative

opinion." *Id.* (citing *Elliott v. Metro. Life Ins. Co.,* 473 F.3d 613, 620 (6th Cir. 2006)). Thus, a

plan administrator is not bound to accept a treating physician's opinion, but the administrator

may not reject a treating physician's opinion without reason. *Id*. *See also Wooden v. Alcoa, Inc.*,

511 F. App'x 477, 483-84 (6th Cir. 2013) ("Reliance on other physicians is reasonable so long as

the administrator does not totally ignore the treating physician's opinions.") (citing *Balmert v.

Reliance Standard Life Ins. Co.,* 601 F.3d 497, 504 (6th Cir. 2010)).

Generally, when a plan administrator chooses to rely upon the medical opinion of one

doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the

plan administrator's decision cannot be said to have been arbitrary and capricious because it

would be possible to offer a reasoned explanation, based upon the evidence, for the plan

administrator's decision. *McDonald*, 347 F.3d at 169 (citations omitted).  However, where the

medical evidence establishes that the plaintiff's diagnosis and condition have remained

unchanged since the claimant was first diagnosed with those conditions and was awarded LTD

benefits, the decision to terminate benefits may be found to be arbitrary and capricious. *Id*.

Whether a doctor has physically examined the claimant is one factor that the court may

consider in determining whether a plan administrator acted arbitrarily and capriciously in giving

greater weight to the opinion of its consulting physician. *Kalish v. Liberty Mutual/Liberty Life

Assur. Co. of Boston*, 419 F.3d 501, 508-09 (6th Cir. 2005) (citing *Calvert v. Firstar Finance*,

409 F.3d 286, 295 (6th Cir. 2005)) ("[W]e find that the failure to conduct a physical examination

. . . may, in some cases, raise questions about the thoroughness and accuracy of the benefits

determination.")).

**V.  OPINION**

Prudential's denial letters "should be the principal point of reference" in the Court's

review of the challenged denial of benefits. *University Hosps. of Cleveland v. Emerson Elec.*

*Co.,* 202 F.3d 839, 848 n. 7 (6th Cir. 2000). In its initial July 29, 2010 denial letter and the subsequent September 2011 and June 2012 letters upholding its decision, Prudential determined that plaintiff did not have any current restrictions or limitations that would preclude her from returning to work in her regular occupation as of August 1, 2010, and she did not remain disabled beyond that date. (AR 472-74, 449-52, 437-40). In its final denial letter, Prudential concluded that although plaintiff has a documented history of cardiac disease, diabetes, hypertension and depression, "these conditions were treated successfully" and "[t]here was no evidence of *a severe change* in any of her medical condition(s) that warranted further work impairment." (AR 440) (emphasis added). For the reasons explained below, the Court finds Prudential's determination that plaintiff's medical conditions improved to the point where she was no longer disabled was not the result of a principled, reasoned decision-making process and is not supported by substantial evidence.

There is no question that Prudential conducted an extensive review of the medical evidence in this case. Prudential sought the opinions of several reviewing medical sources and an examining physician. However, Prudential's review and analysis of the medical and other evidence of record fails to demonstrate appreciable improvement in plaintiff's Ischemic Heart Disease, the condition which led to the initial award of LTD benefits (*see* AR 437), and falls far short of showing that plaintiff's Ischemic Heart Disease and other conditions had been "treated successfully." (AR 440).

First, in reaching its conclusion that plaintiff's Ischemic Heart Disease and other conditions had been "treated successfully" and that plaintiff "should have been capable of returning to work in her regular occupation as of August 1, 2010" (AR 440), Prudential failed to consider the opinion of plaintiff's "longtime" treating cardiologist, Dr. Kereiakes, that plaintiff

24

was "permanently disabled" as stated in his letter dated August 16, 2011. (AR 92). Nor does Prudential address the treating physician's letter of September 7, 2010, stating: "Her last stress test in May of 2009 was abnormal with myocardial ischemia in the basal inferior wall, which was consistent with her known coronary anatomy and blockages. She continues to have symptoms of exertional chest discomfort, along with episodes of dyspnea with exertional activities. We are treating her medically at this time to try to improve and decrease the frequency of these symptoms with Aspirin, Plavix, Cardizem, Benicar, Maxzide, Lipitor, and Nitroglycerin." (AR 346). Because Prudential failed to address the opinions of Dr. Kereiakes, a specialist with expertise in treating plaintiff's heart condition and a long-term history of caring for her, its reasons for rejecting the treating cardiologist's opinions cannot be discerned from the administrative record. While Prudential was not bound by the treating cardiologist's opinions, neither was Prudential entitled to disregard the opinions without good reason. Prudential's failure to address Dr. Kereiakes' opinions suggests that the decision to terminate plaintiff's LTD benefits was not the result of a principled reasoning process. *See Glenn*, 461 F.3d at 672 ("the failure to consider evidence that is offered after an initial denial of benefits renders a final denial of benefits arbitrary and capricious") (citing *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712-14 (6th Cir. 2000)).

Although Prudential acknowledged the opinion of total disability rendered by plaintiff's treating internist, Dr. Palermo, in August 31, 2011, Prudential failed to provide a reasoned basis for rejecting Dr. Palermo's opinion. (*See* AR 451). Prudential stated it had contacted Dr. Palermo's office for an update after receiving a report from IME Dr. Hogya, whereupon Prudential learned that plaintiff had last been seen by Dr. Palermo in 2010 and by a registered nurse in his office in April 2011. (AR 451). Prudential stated it was adopting the opinion of Dr.

Hogya, which was issued in August 2011, over that of Dr. Palermo because Dr. Hogya had

provided "the most up to date assessment based on direct examination of your condition." (AR

451). In effect, Prudential accepted the opinion of Dr. Hogya, an emergency medicine specialist,

over the opinion of Dr. Palermo, a treating physician with long-term knowledge of her

conditions, simply because Dr. Hogya had examined plaintiff several months later than had Dr.

Palermo or any member of his medical staff. Yet, Prudential did not explain why it believed a

more recent assessment of plaintiff's condition to be more accurate. The evidence shows that

plaintiff has suffered from chronic heart disease throughout the relevant time period. Prudential

did not point to any new medical evidence or other information that was generated between the

date she was last evaluated by her treating physician and the date she was examined by Dr.

Hogya which demonstrated a change in her chronic heart disease and overall medical condition

during the intervening time period. Absent evidence of a significant change in plaintiff's

medical condition between the date she was last evaluated by Dr. Palermo or a member of his

staff and the date Dr. Hogya issued his assessment, Prudential's decision to adopt the IME's

opinion over that of plaintiff's treating physician on the sole ground the IME's opinion was the

more recent opinion was not reasonable. *Cf. Neaton*, 517 F. App'x at 476 n. 2 (it is unreasonable

for a plan administrator to find that a claimant ceases to be disabled absent a change in the

claimant's underlying medical condition); *Walke v. Group Long Term Disability Ins.*, 256 F.3d

835, 840 (8th Cir. 2001) (overturning plan administrator's termination of benefits where nothing

in record demonstrated medical improvement or change in circumstances to warrant termination

of benefits).

Similarly, Prudential's decision to accept the findings and opinions of Dr. Hogya and the

file review physicians over those of Dr. Fritzhand, an IME selected by plaintiff who issued a

26

report in March 2012 concurring with the treating physicians' opinions of total disability, was

not the result of a principled and reasoned decision-making process and is not supported by

substantial evidence. Rather, a review of Prudential's decision discloses that Prudential "cherry

picked" findings from Dr. Fritzhand's report which supported a finding a non-disability and

ignored Dr. Fritzhand's findings and opinions which favored a conclusion of disability.

In its June 2012 decision denying plaintiff's second request for reconsideration,

Prudential stated it had received Dr. Fritzhand's report and had submitted the updated medical

records and IME reports prepared by Drs. Hogya and Fritzhand to Dr. Fallon, an occupational

medical specialist, for a file review. (AR 439). Prudential noted that according to Dr. Fallon,

plaintiff had been "medically stable since July 31, 2010," and there was "no medical record

supporting impairment due to cardiac, hypertension or vascular conditions," there was no

significant change since the external cardiac physician's review dated February 22, 2011, and

physical examinations and testing remained stable. (*Id*.). Prudential noted that in her report, Dr.

Fallon stated that Dr. Fritzhand documented that plaintiff's heart rate was regular without

murmur or gallop, there was no evidence of peripheral vascular insufficiency, varicose veins or

stasis ulcers, her lungs were clear, there was no evidence of congestive heart failure, and her

peripheral vascular status was reasonably intact. (AR 439-40). Prudential noted that Dr.

Fritzhand did not find any abnormalities or elevated vital signs and that on neurologic evaluation

of the lower extremities, there was no evidence of muscle weakness or atrophy. (AR 440).

However, this summary of Dr. Fritzhand's report paints a distorted picture of the examining

physician's findings and conclusions by omitting extensive findings Dr. Fritzhand made

regarding plaintiff's history and physical examination, including the following:

[Plaintiff] was initially hospitalized with coronary artery disease in February 1992 undergoing triple coronary bypass grafting on March 4, 1992. Unfortunately, she had chest pain shortly thereafter, and a follow-up cardiac catheterization three months later revealed ischemic changes as well as vein graft occlusion of the lateral circumflex and the distal right coronary artery. She had "severe three vessel coronary artery disease in this postoperative study." The patient was noted to have "multiple saphenous vein failures." She has had intermittent chest pain over the succeeding years. The patient required angioplasty and stenting on September 26, 2006 as well as on January 8, 2007. She also required "percutaneous transluminal angioplasty and stent deployment of the left subclavian artery" in January 2007 for a left subclavian steal syndrome. Aortic evaluation in July 2007 revealed "aortic and bilateral common iliac artery stenosis." She was also noted to have "20-49% stenosis" on a carotid duplex ultrasound in February 2008. Dr. Kereiakes noted in September 2010 that "her last stress test in May of 2010 was abnormal with myocardial ischemia in the basal inferior wall . . . she continues to have symptoms of exertional chest discomfort, along with episodes of dyspnea with exertional activities. . . . She was noted to have "perfusion evidence of mild stress-induced ischemia involving the RCA coronary distribution . . . inferior ischemia . . ." [] in September 2010. The patient continues to have both shortness of breath and chest pain. . . . She has intermittent episodes of "like a discomfort" present over the substernal and left parasternal regions with radiation to the left arm, occurring "on a daily basis," lasting up to thirty minutes, and responding to 1-2 sublingual nitroglycerines. Chest pain is related to both stress and exertion. The patient takes 2-4 nitroglycerines daily. . . .

. . . .

In summary, this is an unfortunate morbidly obese middle-aged woman with longstanding coronary artery disease who has required extensive coronary revascularization. She subsequently has required multiple percutaneous coronary interventions as well as intervention for a left subclavian steal syndrome. She continues to have ongoing shortness of breath and chest pain requiring 2-4 nitroglycerines daily for treatment of angina pectoris. . . . She also has ongoing pain and discomfort especially involving the low back and right knee. She ambulates with a slow limping gait and had difficulty forward bending. Range of motion studies are diminished. . . . She is incapable of performing even a mild amount of ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects. Her illnesses are so great that she would be unable to perform remunerative employment.

. . . .

It is certainly my medical opinion that Ms. Schowalter is totally disabled as defined in her long-term disability policy. She certainly has "continuous inability . . . due to sickness . . . to engage in each and every occupation or employment for wage or profit that he or she is reasonably qualified to do. . . ." Ms. Schowalter has had severe coronary artery disease for many years and has suffered from cerebral and peripheral vascular disease. . . .

(AR 43-47).

As the above summary demonstrates, Dr. Fritzhand's report is replete with findings

indicating that plaintiff continues to suffer from severe coronary artery disease with disabling

symptoms. Yet, Dr. Fallon and Prudential "cherry picked" the report to cull only those findings

that supported the conclusion that plaintiff no longer suffered from disabling coronary artery

disease and medical conditions while making no attempt to explain why Dr. Fritzhand's ultimate

conclusion of total disability and supporting findings were not entitled to consideration.

Prudential's reasoning in this regard was neither principled nor reasoned. To the contrary,

Prudential acted arbitrarily and capriciously by "cherry-picking" evidence from Dr. Fritzhand's

report to portray plaintiff's condition in a favorable light. *See Spangler v. Lockheed Martin

Energy Sys., Inc.,* 313 F.3d 356, 362 (6th Cir. 2002) (the administrator's decision may be

arbitrary and capricious where the administrator "cherry-pick[s evidence] in hopes of obtaining a

favorable report"). *See also Metro Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (it

is arbitrary and capricious for a plan administrator to justify a decision to terminate coverage by

engaging in a "selective review of the administrative record") (quoting *Moon*, 405 F.3d at 381).

Instead of relying on the consistent opinions of continuing disability rendered by

plaintiff's treating physicians and IME Dr. Fritzhand, Prudential relied on the findings and

opinions of IME Dr. Hogya and file review physicians Drs. Eaton and Fallon to conclude that

plaintiff's medical conditions had been "treated successfully" and that plaintiff "should have

been capable of returning to work in her regular occupation as of August 1, 2010." (AR 440).

However, Prudential did not provide a reasoned explanation for its decision. Prudential

reviewed the findings of each of these physicians in the denial letters, but Prudential did not

explain how the findings document improvement in plaintiff's Ischemic Heart Disease and other medical conditions.

In its final denial letter, Prudential set forth Dr. Hogya's findings that "there was not much found relative to [plaintiff's] physical diagnosis in terms of impairment"; her hypertension and diabetes were well-controlled; her CAD was "stable post triple bypass of 1992 with stenting in 2006 and 2007"; the September 21, 2010 stress test reportedly showed a moderate reversible inferior wall defect with an excellent ejection fraction of 77% and no dysrhythmia or congestive heart failure; and plaintiff's self-reported symptoms and limitations "far outweighed the findings and testing." (AR 438). It is difficult to discern from these findings how plaintiff's Ischemic Heart Disease and overall medical condition improved between the date she was awarded benefits and the date her benefits were terminated. To the contrary, Dr. Hogya's findings that plaintiff's condition remained "stable" after 1992, that she required additional stenting in 2006 and 2007, and that testing disclosed a new heart defect in 2010 suggest that plaintiff's heart condition remained unchanged and that she experienced periods of exacerbation. Prudential did not explain how Dr. Hogya's report demonstrated improvement in plaintiff's condition in view of these findings.

Similarly, it is not clear from Prudential's final decision how, if at all, the findings of file review physician Dr. Eaton demonstrate improvement in plaintiff's condition. In the June 2012 final decision letter, Prudential relied on Dr. Eaton's findings that the medical records did not disclose symptoms consistent with "progressive angina pectoris, decompensated heart failure [or] clinically significant cardiac dysrhythmia"; plaintiff had not required coronary angiography for recurrent chest pain in the last three years; and there was no documentation of inpatient hospitalizations or emergency room visits for chest pain. (AR 437-38). Prudential stated that

according to Dr. Eaton, "[d]espite known coronary artery disease review of the medical records does not provide objective medical documentation to preclude full-time work from a cardiovascular standpoint (eight hours daily/40 hours weekly) in a light work level occupation." (AR 438).   However, Prudential provided no explanation as to how Dr. Eaton's findings showed improvement in plaintiff's Ischemic Heart Disease subsequent to the initial disability determination in 1995.   Moreover, Prudential's decision provides no explanation of the significance of two abnormal heart test results which Dr. Eaton had included in his report: (1) a stress echocardiography performed in May 2009, which demonstrated evidence of exercise induced inferior wall hypokinesis, and (2) a reversible inferior wall perfusion defect noted on myocardial perfusion imaging performed on September 21, 2010.  (*See* AR 170-71).   Nor is there discussion in the decision of whether the defects noted on the tests were a source of plaintiff's symptoms.   Absent any explanation as to how Dr. Eaton's report noting continuing CAD and abnormal heart test results demonstrated improvement in plaintiff's condition, Prudential's reliance on the report to find that plaintiff had improved to a degree that she was able to return to work in her regular occupation (AR 437-38) was not the product of a principled, reasoned decision-making process.  *See Kramer*, 571 F.3d at 507 (administrator's decision to cancel benefits that had been paid for five years following the initial determination of disability could only be described as arbitrary and capricious where there was no medical evidence to show improvement during that time period, and in fact medical opinions supported the proposition that the plaintiff was never disabled, a conclusion which flew in the face of all of the other evidence of record).

Finally, Prudential's reliance on the file review of Dr. Fallon, a physician board certified in occupational medicine, to find that plaintiff did not remain impaired after July 31, 2010, was

arbitrary and capricious. (AR 439-40). Prudential relied on findings by Dr. Fallon that the records did not "support progression or deterioration" beyond July 31, 2010 and that plaintiff remained "medically *stable* since July 31, 2010." (AR 439) (emphasis added). The specific records noted include a September 7, 2010 record from The Ohio Heart & Vascular Center, which according to Prudential reported that plaintiff was *stable* post CAGB/stenting (*see* AR 14-15); a May 4, 2011 record which included findings of *stable* carotid artery disease, hypertension and hyperlipidemia (*see* AR 16-17); and a November 2, 2011 record which reported that plaintiff was "doing okay" from a cardiac standpoint (AR 19). (AR 439). However, neither Dr. Fallon nor Prudential explained how findings that plaintiff's condition had remained *stable* subsequent to the July 31, 2010 benefit termination date support Prudential's decision that plaintiff's disability had ceased. Plaintiff was initially awarded benefits under the Plan in 1995 because she was unable to perform her regular occupation. (*See* Doc. 20-1, Plan § 2.6). Prudential decided to terminate plaintiff's benefits effective July 31, 2010, because it determined her condition had improved to the extent that she became able to perform work in her regular occupation. Dr. Fallon's findings that plaintiff's condition had neither progressed nor deteriorated but had remained "stable" connote a lack of change in plaintiff's medical condition, not an improvement in her condition, subsequent to July 31, 2010. Further, Dr. Fallon did not address whether there had been any change in plaintiff's medical condition during the 15-year period prior to July 31, 2010, when she was indisputably incapacitated. Thus, Dr. Fallon's conclusion that plaintiff had remained medically "stable" and had neither progressed nor deteriorated after July 31, 2010, does not provide a reasonable basis for Prudential's conclusion that plaintiff's disability had ceased following the initial disability determination and benefits award in 1995. *See Kramer*, 571 F.3d at 507.

32

The Court is convinced upon a review of the administrative record that Prudential's decision finding that plaintiff ceased to be disabled after a 15-year period and its decision to terminate plaintiff's LTD benefits was arbitrary and capricious. Prudential arbitrarily selected July 31, 2010, as the date plaintiff's condition ceased to be disabling without demonstrating how her condition had improved over the preceding 15-year time period during which she was indisputably disabled. The evidence of record documents that plaintiff continued to suffer from severe coronary artery disease and other medical conditions following the July 31, 2010 termination date. In determining that plaintiff's medical conditions had nonetheless been "treated successfully" and her condition had improved to the extent that she "should have been capable of returning to work in her regular occupation as of August 1, 2010" (AR 440), Prudential rejected the opinions of plaintiff's treating cardiologist and treating physician that plaintiff remained disabled in favor of opinions by examining and reviewing physicians that plaintiff's restrictions and limitations would not preclude plaintiff from performing light or sedentary work, without providing adequate reasons for its determination. While Prudential was not bound by the treating physicians' opinions of total disability, it was obligated to provide valid reasons for rejecting these opinions, which it failed to do. In fact, Prudential made no mention of these opinions in its final denial letter. Prudential's implicit rejection of the opinions of plaintiff's treating physicians without explanation, the "cherry picking" of Dr. Fritzhand's report, and Prudential's failure to point to objective findings which document any significant improvement in plaintiff's condition from the time plaintiff was initially granted LTD benefits in 1995 to the time of the termination of her benefits by Prudential in July 2010 and thereafter such that plaintiff regained the ability to perform substantial and gainful employment, demonstrate that Prudential's decision was arbitrary and capricious. Prudential's decision is not the result of

33

a reasoned decision-making process and is not supported by substantial evidence. *See Neaton*, 517 F. App'x at 476 n.2 (it is unreasonable for a plan administrator to find that a claimant ceases to be disabled absent a change in the claimant's underlying medical condition) (citing *Walke*, 256 F.3d at 840) (overturning plan administrator's termination of benefits where nothing in record demonstrated medical improvement or change in circumstances to warrant termination of benefits). For these reasons, the decision to terminate plaintiff's LTD benefits effective July 29, 2010, is arbitrary and capricious and should not stand.

## VI. REMEDY

Where a plan administrator's final determination is arbitrary and capricious, the Court may either award benefits to the claimant or remand to the plan administrator." *Elliott*, 473 F.3d at 621 (citations omitted). Where the decision to terminate LTD benefits was arbitrary and capricious, the appropriate remedy is reinstatement of benefits. *Neaton*, 517 F. App'x at 487 (citing *Glenn*, 461 F.3d at 674-75); *Evans v. UnumProvident Corp.*, 434 F.3d 866, 880 (6th Cir. 2006); *McDonald*, 347 F.3d at 166 ("affirming district court's order reinstating benefits after finding that 'Western-Southern's decision to terminate McDonald's LTD benefits was arbitrary and capricious because Western-Southern could not offer a reasoned explanation, based upon the evidence in the administrative record, for finding that McDonald was able to engage in gainful employment and, thereby, rendering him ineligible for LTD benefits under the plan.'")). Accordingly, because (1) Sara Lee previously determined that plaintiff was entitled to continued LTD benefits and (2) plaintiff presented objective evidence of ongoing disability based on the test results and the opinions of her treating physicians, the Court finds that plaintiff remains presumptively entitled to the continuation of her previously awarded LTD benefits. *See, e.g., id.*

A retroactive award of long-term disability benefits wrongfully withheld and reinstatement of plaintiff's long-term disability payments is the appropriate remedy in this case. *Id.*

**IT IS THEREFORE RECOMMENDED THAT:**

1)  Plaintiff's motion for judgment on the administrative record (Doc. 19) be **GRANTED** and plaintiff be awarded benefits consistent with this opinion.

2)  Defendants' motion for judgment on the administrative record (Doc. 20) be **DENIED**.

Date: 7/14/14

Karen L. Litkovitz
United States Magistrate Judge

35

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DOREEN T. SCHOWALTER,                    Civil Action No. 1:13-cv-249
     Plaintiff,                        Weber, J.
                                     Litkovitz, M.J.

     vs.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA, et al.,
     Defendants.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).